Good morning. I am David Newdorf representing Sheriff Michael Hennessy, the defendant and appellant in this case. And I want to start this morning with one of the very large number of true, dramatic, sad stories that are in this record. Because the example I want to in this case. For many years, Sheriff Hennessy, like most of the sheriffs in California, for reasons of keeping inmates, staff, and public visitors safe, had a policy of strip-searching prisoners after they'd had a reasonable opportunity to post bail, after they'd been evaluated to see if they were eligible for a citation release, where they had a court date and returned out to the street, had a policy before and at the time that they were going to be placed in the general jail population, when they were changed into prisoner clothing, of conducting a visual strip search. During this litigation, that policy changed in January of 2004, and... Who has a cell phone? Could you turn it off and leave the courtroom, please? The policy changed during this litigation in January of 2004. At that time, during arguments in another phase of this pending case in the district court, the number two official who oversees the jails stated, and it's in the record, that fewer strip searches under the newer policy would result in more contraband, dangerous contraband, finding their way into the prison. That statement was made in January of 2004. In July of 2005, a man was arrested, brought to county jail, a man about my age, who didn't, there's no record that he had any drugs on him at the time. After 11 days at the San Francisco County Jail, he somehow managed to obtain a fatal dose of cocaine and died of acute cocaine intoxication. And that's in your brief, so we've read that. And the reason, I think Judge Akuta has a question. Yes, Your Honor. I guess the problem I had, and this is a good example of it, is that there was no evidence that a member of this particular class was the source of this contraband that came into the prison. And unfortunately, the example I gave, the undersheriff recognized that they may never know exactly how that contraband may have made that dangerous contraband. One of many items of contraband found through searches made its way in. But the question is, how does that help, then, with the Belvey-Wolfish test? I mean, the district court actually said if you had more evidence, the balance might come out in a different way. But he found that there wasn't that evidence, and I didn't see it either in the record. Your Honor, Belvey-Wolfish is an excellent case for the sheriff. In that case, there was in the record one documented case of smuggling. And applying the balancing test of the extent of the intrusion caused by the search against the interests of the prison that were being conducted, strip search, visual strip search, did not offend the Fourth Amendment. Here we have a much greater record. And let me go back to that. Do you have anything, though, that ties it to the class? The district court said no. I mean, the district court really was pretty careful, I think, in limiting the discussion to various subclasses. And we have this subclass identified here. What's your best evidence in the record that there is a problem with this particular subclass as opposed to a generic problem? I went back through the record, because I know that this question was important to the district court, is important to this court, and there is evidence. There are several people in the record in this appeal who were not drugs, weapons, or violence, who were found with dangerous items of contraband on them. It's on page 609 of the record.  I'm not sure if there's any evidence that there were eight-inch scissors found on a prisoner. Is that the one with the hair? Excuse me? Excuse me? I thought it was found in her hair or something. But she was not go ahead. It's not in the hair. And we don't know where it was found. Similarly with the item in the person's shoe, it didn't seem to support the need for the sort of visual strip search that was at issue. Your Honor mentions the shoes. There are 88 cases of dangerous contraband, which is drugs and weapons, in this record. Of them, the vast majority there are some that are found and hidden in shoes. The vast majority in the record are found in shoes. The record where it's identified, and I can give you the number that I calculated from the record, of those 88 incidences that are body searches. You would agree that a search of a shoe is not a body search? It is part of the routine strip search, but I did look at what Judge Ikuda asked about, which is, you know, there were some items of contraband found in shoes during the course of a strip search, but that's not the biggest part of it. 62 out of the 88 were found on the body. Of those 62, 47, and this is in the record, were found secreted in the vagina, the buttocks, the rectum, the bra or underwear. These items, as the record shows, demonstrate the reasonableness of this search policy. These are items that could not be found. But there's no evidence that it's relating to this class. That's the difference. Well, let me get back to that, Your Honor, because I do think that Judge Ikuda has a follow-up question. It's just a follow-up. It's just this Venn diagram of the class and the contraband and the need for finding that contraband via a strip search, and that's where I didn't find any, though I was looking for them in apparently the district court. Let me help you with the record, then, because a class member, and by the way, when I say class member, I mean non-drugs, weapons, or violence who happens to be within the class period as defined by the court. I think that the relevance is broader than that, which is non-drugs, weapons, or violence who happen to be before the class period starts. We don't have non-drugs, weapons, or violence after January of 2004, because that's when we stopped searching the non-drugs, weapons, or violence. But even if you're just looking at the narrow issue of class members, look to page 609 of the record. Look to page 601. Cocaine powder, that's a shoe case, but as I stated, the vast majority of these findings that were brought in were not in the shoes, they were found in the body, and in fact, the majority of them were found in a way that would only be uncovered through this type of search. But would you restrict me, because I think we know the generic, we've read the record and the briefs, we know the generic arguments as to the amount of contraband. What I'm concerned about is if you have specific references that contraband found on these class members. You start answering 601, 609, do you have anything else? Because then you leap into all sorts of other examples that I think are not related, at least in this record, to the class members. Yes, Your Honor. At page 527, an arrestee for public inebriation, he was found with rock cocaine in his buttocks. And more than that, what we know, since most of the, as the trial court found, it wasn't clearly identified in this record what the charges were. But before this court, in the York case, we did, we came back, that York was argued after this bull motion was argued. We did identify what the arrest charges were. And what we found, and it's in the York record, is that approximately 20 percent... Can you kind of bootstrap some evidence in another case? I don't think it's bootstrapping for a couple of reasons. For one thing, it's a related case. It is a case that was identified as a related case, and it's, I mean, the dismissal I don't believe is final yet, but even if it were final, this Court's decision were final, this is subject to judicial notice under Federal Rules of Evidence 201. This Court may take judicial notice at any stage of proceedings. And did you make a motion for us to take judicial notice of that? Your Honor, the answer is no, and the reason I didn't is it was just a little over a week ago. Until a week ago, York was going to be argued today as well. I didn't, until the dismissal, consider the need for a written motion. But the Federal Rules of Evidence don't require a written motion, and if the Federal Rules of Appellate Procedure do, I'm sorry, I wasn't aware of that. However, I do believe that this panel wants to make the right decision, and it wants to consider what the answer to Judge Akuta's question is, which is how much of this very serious, some dispute that it's a serious problem. How much of this problem, then, is related to people who are not arrested for drugs, weapons, or violence? And I think it's important for us to look at the York record. And you will find that of the – it's the same record except for the identity. But rather than spend a time on that now, why don't you make a motion and identify those portions of the record which you would like us to take judicial notice of, and then your opponents can have a chance to respond as well. But let's not take up argument time quarreling about that, okay? You can make a motion afterwards. That's fine. Yes, Your Honor. We'll take – we'll accept your representation. There are portions of the record you'd like us to look at to answer the question, all right? Thank you. And it just occurred to me that I didn't reserve five minutes for a photo, which I would like to show. Judge Stone has a question. I'd like to come at this problem from a slightly different perspective than my colleagues have been questioning you. Am I understanding your argument correctly? You're referring to the portion in Bell v. Wolfish where Justice Rehnquist talked about the fact that even if only one search yields contraband after a contact visit, that is sufficient to establish a legitimate peniological interest for the strip searches in that case. Is that correct? Yes, Your Honor. And so is there not an assumption in all of the Ninth Circuit cases that there is some sort of logical connection between the nature of the original arrest offense and whether or not this particular person might be smuggling contraband into the jail? Isn't that where our cases have essentially come from? Yes and no, Your Honor. The nexus is what establishes reasonable suspicion. The sheriff's argument in this case is that under these same precedents, suspicionless searches are justified under Bell v. Wolfish, which was a suspicionless search case. I don't think anyone can justify the Ninth Circuit precedent because in qualified immunity cases we look at the law of our circuit and not just what the Supreme Court said in Bell v. Wolfish. You've got all these cases that basically say you can't use the fact that someone's coming into a general prison population as the sole factor. The Ninth Circuit cases say that intermingling alone is not sufficient. Right. The Ninth Circuit cases, the very same cases, do recognize that the jail has heightened security concerns when someone is being moved into the general jail population. What the Ninth, and I'd ask the Court to take a careful reading of Giles because I believe that the district court misread it. I believe that the district court took this Court's Giles decision as a per se rule that pre- that strip searches at the time of entry into the general jail population always required reasonable suspicion. I don't read it that way. The sheriff doesn't read it that way. Because what Giles said at page 617 is that balancing the interest in this case against the privacy interest of arrestees, we hold that arrestees charged with minor offenses may be subject to a strip search only if jail officials possess a reasonable suspicion. The reason I read that portion of the case is that it's clear that Giles was doing a balancing test based on, as in all Fourth Amendment cases, based on the facts of that case. The facts of that case were in several thousand searches, they found a pack of cigarettes and a knife over several years. This case, and by the way, the subsequent Ninth Circuit cases had no reason to focus on that balancing test because none of the other defendants created any record at all. They simply argued that the security concerns of the jail justified these intrusive searches. What this case has, and I will supplement it, I appreciate the Court's request for supplemental briefing. I'm not saying we're going to grant it, but I think that's the best way to address the issue for notice if you want to do that. Well, I think you're starting to get to the answer to my question, which probably wasn't very well propounded. But it seems to me that there is an inherent assumption in all of our cases that we first look to the nature of the charge for which the person has been arrested and that that somehow serves as a predictor or an indicator of whether or not this is the type of person who might be smuggling something into the jail. Am I correct in reading that into our cases? I agree with that. Okay. And is your position that that premise is fallacious, that nobody gets up in the morning thinking, I'm going to get arrested today, and therefore decides not to put contraband on their person or carry a weapon or whatever might be the case, and if they happen to get arrested, the question is whether or not, without reasonable suspicion, the sheriff should be permitted to strip search basically everybody who comes in, who's going to remain in custody and is not going to be released on O.R. or bail? Are you following my question? Yes. And that's close to the city's analysis of the reality. And, again, I think that what the Ninth Circuit cases do is they look at the record and look at this record, and what it shows, much more so than any of the prior cases, is that people come into the jail with a large amount of contraband. Even in this Bull case, there are ---- You're answering Judge Tomlin's question, though, because we're talking about this. The legal analysis of our circuit cases seems to require at least a nexus between the offense as a predictor and something else. We don't have any cases that allow, in the Ninth Circuit, you'd agree, that allow a suspicionless search that is not tethered to the offense but is only directed to the danger of releasing someone into the general jail population. There's no case that holds that, is there? There's language in Kennedy that I think is not the holding of the case but shows the analysis under Belle v. Woolfish. And Kennedy states that the ---- The critical inquiry, I'm quoting from Kennedy, is whether the LAPD had sufficient justification for imposing its blanket search policy. Right. And that's the critical justification in this case, not ---- But I know. Didn't it conclude that the LAPD fails to offer serious justification for subjecting all felony arrestees to body cap search as a matter of course? That's apparently because the defendants in that case did not offer any evidence of the magnitude of the problem that justified these intrusive searches. So to get to where I was trying to get with my question, so is the city's position basically that notwithstanding the fallacious premise, your actual evidence of the contraband problem, which I think on this record is beyond cavil, shows that the current method of trying to restrict searches based on the reason for the arrest is simply not working, that there's just too many instances of contraband and weapons getting into the jail such that we ought to revisit the balancing and recognize that the legitimate penological interests articulated in Bell to maintain the safety and security of everybody at the jail requires strip searching of all people who are going to be placed into custody and mixed in with the general population? I agree with that. I agree with that statement. However, I don't think that we need to change any Ninth Circuit precedences to find no Fourth Amendment violation in this case because this Court follows as it must the Supreme Court case of Bell v. Woolfish. And the articulation is the same. How do you square that with, say, ACTA versus Portland? And let's take a hypothetical assumption that there's somebody in the member of the class who's charged with a minor offense, which is likely, right? I'm sorry. Assume a person charged with a minor offense. A minor offense, right, is subject to a strip search without any other suspicion. How do you square your position that it's justified under Ninth Circuit law with cases like ACTA versus Portland? I mean, ACTA versus, because you don't have to. Let me read this to you. At the time, and this is a clearly established issue, at the time the appellant strip searched the appellees, it was clearly established in this circuit that it is unlawful to strip search an arrestee brought into a jail facility on charges of committing a minor offense unless the officer directing the search possesses a reasonable suspicion that the individual arrestee is carrying or concealing contraband. I mean, ACTA versus Portland, which is decided before all of us are on this Court, the site of that said that it was clearly established way back then that on minor offenses you just can't strip search somebody. Your Honor. Are you arguing we ought to overrule that? No, Your Honor. So how do you square your position with all of this language? You need to look at ACTA on its facts. And ACTA, like Giles, like Kennedy, clearly stands for a proposition that the sheriff isn't violating. That proposition is that you can't strip search someone while they're waiting for bail when you know that they are going to be out of the jail, likely out of the jail, in a few hours. That's the other main difference, apart from the record. And there's two main differences, and then I'll want to save at least a little bit of time, if I may, for rebuttal. There's two main differences. The record, the other is that none of these plaintiffs would have been strip searched in Sheriff Hennessey's jail. The ACTA plaintiffs were protesters who, from the time of arrest to the time of release from the detention center, a large group was released in five hours. They knew that they would be eligible for a cetacean release, that they weren't going to be transferred to the general jail population. They strip searched them anyways. The policy in San Francisco has always been not to conduct a front-end search on minor offense arrestees, but to wait, give them three or four hours minimum, at times much longer than that, to see if they are the people who are likely to be transferred to the general jail population, at which time the Ninth Circuit cases do recognize that the jail has a heightened interest in security. You were about a minute over your time. Thank you. Thank you. May it please the Court, Your Honors, I'm Mark Marin. I'm joined with Andy Schwartz, counsel table, and Kathleen Williams, also counsel, who's in the courtroom. I don't think there was a third chair at table. Okay. And also Mary Bull, lead representative plaintiff, is also present this morning, Your Honors. You have posed some interesting questions for Mr. Newdorf that I don't think he adequately answered, and I'd like to weigh in on some of them. If you could help me with mine. Am I correct in reading our Ninth Circuit case law that is the premise that there are certain classes of offenses for which we may presume that a person arrested for a minor offense simply does not pose a risk to the – of smuggling? Yes. I believe that's the case. And if that's the case, then how do you explain the fact that we've got all this contraband in the San Francisco County Jail, notwithstanding the fact that more violent offenders are clearly being strip-searched? Well, that's a good question, Your Honor. And most of the statistics that were gathered, in fact, were gathered during the time that the jail was strip-searching members of this class as well. In other words, they were strip-searching everybody going into housing. Well, not everybody. Apparently there's still a group of people who are not being strip-searched. Am I right? At the time that the statistics were gathered that showed there were 1,574 fines by the K-9 unit throughout the jail, that was during the time that the custodial search was, in fact, being conducted, precisely the search that is attacked in this case. In other words, this group of minor offenders who were not charged with a crime relating to violent drugs and weapons, had not been on parole or probation, had not had any kind of previous incident within the last five years, and for whom, according to the defendants in this case, there was no reasonable suspicion to search. Nonetheless, they were being searched when they went into housing. So if we strike down the policy, then it's going to get worse, isn't it? Well, no, Your Honor, because during that period of time, no contraband was found on the members of that class. Now, if I were the sheriff, I would start looking at other sources of contraband being introduced into that jail. And, of course, we know, just from reading the newspaper, that many jails have found that there are other sources, including their own personnel. Let me put the question to you differently. If we rule in your favor in this case, what's the difference then between strip-searching all of the inmates who are delivered to the custody of the United States Bureau of Prisons? Well, people who are delivered, I assume, are already convicted and serving a sentence. If that's what you're referring to, I think... But I'm not sure that the status of conviction makes any difference if we're talking about preventing smuggling into the jail. Smuggling comes because someone comes from the outside and gets in. And the question is, what are the legitimate measures that the sheriff or the prison warden can impose in order to address a very real problem that I think we can take judicial notice of in this and in other cases exist in every correctional facility in the nation? Well, I think the sheriff failed to establish the premise, and that is that members of this class were, in fact, responsible for any contraband. And we're talking about a very short period of time, Your Honor. We're talking about pre-arraignment. We're talking about the time when a person is actually housed until the time or, let's say, classified for housing, until the time that that person is arraigned. And in many of the cases, as we've seen in the record, persons are, in fact, classified, never housed, taken to court, but before they're taken to court for their arraignment, they are, in fact, strip-searched. Let me ask you, if there were evidence that was substantial, that either this class was contributing to the contraband problem, either directly or by circumstantial evidence, wouldn't that require us to look again at the Belvey-Wolfish balancing test and possibly say it is constitutional to strip-search these individuals? Or do you say there's a per se rule under our case law? No, I don't think there's a per se rule. I think that you might have to look at whether the evidence that this class, and we can keep saying it's minor offenders for whom there's no reasonable suspicion to believe they're concealing contraband, if the evidence were sufficient that, in fact, contrary to belief, they are, in fact, trying to smuggle contraband into the facility, then there would be some reason to do something else. Now, what the courts have said is that, well, the decision to place the person into housing is not itself a triggering point to determine that now we have reasonable suspicion or we have a significant institutional need to strip-search them because there are alternatives. I mean, clearly we're talking about an institution that can classify persons who are in this minor offender group. And isolate them for the brief period of time that we're talking about. But they're already using wands, metal detectors, visual observations of clothing, pat-down and all that, and it's just not getting the job done. That's what I hear the city saying is that the measures that are currently in place are not preventing deaths in the jail from drug overdoses or weapons from being smuggled in. Well, that is perplexing, Your Honor, but it doesn't point to the need to strip-search this class. And that's what I was attempting to suggest, that one might look at delivery men who are bringing things in, the staff, other ways that this contraband is getting in, but it apparently is not getting into the jail through this class. They are strip-searching everybody except this now under the new policy. The new policy. The old policy is strip-search everybody and they still get the contraband in, right? Exactly. So one doesn't, if one has regard for the extremely humiliating, intrusive nature of these kinds of searches, and other cases describe that in detail. There's no question there's a substantial interest on both sides. And the problem is how we as judges under the directive of Bell v. Wolfish should balance and how far we go in telling jail wardens and sheriffs what measures they may and may not utilize. Well, I think that good guidance is drawn from the court's decisions that have been made already, not just in the circuit. Well, let's just confine it to the circuit, where they've said the decision to strip-search on the basis of the charge that is felony or misdemeanor is irrational. It doesn't make any sense, and that is precluded. The decision to strip-search somebody because they haven't been able to post bail is irrational, and we're going to preclude that. The decision to strip-search somebody solely because they're going into housing is irrational, and we're not going to permit that. So we have some good guidance, and I think a sheriff understanding the law as he should have understood clearly that what he is doing in this instance of strip-searching this group of most benign arrestees prior to arraignment was clearly prohibited. So he should be looking elsewhere. And that's my opinion, and I would say that if he started applying anywhere near the same methods to his staff going into jail, he might make serious inroads in the smuggling problem, but it's not by focusing on this most vulnerable class that's most entitled to protection in all the cases that we've had. But part of the protection, would you agree, is intended for this class as well. We're trying to prevent them from being harmed once they get inside the jail, and obviously we don't want them to be getting drugs either from sources inside the jail. There are other ways to prevent them from being harmed, Your Honor, and one of them would be clearly to just put them in a place where they're not in touch with those who have access to... We're talking about San Francisco County here, but the problem is you want us to announce a rule for the entire Ninth Circuit, which means that we need to be thinking about how this is going to play in the podunk counties and rural county jails where they're... Be careful, I'm from Montana. I appreciate it. And I grew up in a podunk county myself. But we do have to be careful about announcing rules that may simply be completely impracticable in smaller counties. Well, in Boonerville, Iowa. Bonnerville. Idaho. Bonnerville, I'm sorry. I like yours better, but I don't think Idaho would. Let's call that a podunk county. Okay. There the court had no problem saying you can't strip search Giles just because there's no room in the foyer and you're going to put her into a cell or house her. That was not adequate. And they cited Smith v. Montgomery, which was a case that said at least during the trial, we're not going to strip search him unless there's reasonable suspicion. That has been a good standard. That does work. Well, there are two distinctions you're making here. One is, you know, how long is this person reasonably likely to be in custody? And for somebody who is going to OR or bail or have an initial appearance, that may be relatively short. But there's also a distinguishing factor, which is whether or not they're going to go into the general inmate population and go into custody for some period of time. You mean after arraignment? It might be after arraignment. Or the arraignment may be delayed because of a weekend and intervening holidays. It may be three or four days before they get there. This case does not deal with post-arraignment matters. It strip searches pre-arraignment. And the reason we use pre-arraignment is that appears to be a definable time when an accused comes before a judicial officer for the first time and has an opportunity in this county to obtain OR. In many instances, there are no charges even filed because a district attorney has had an opportunity to look at whatever came in. But let's assume that takes 72 hours. The sheriff still has the practical problem of where do I put this person? And if the answer is, all I've got at that point, once they don't bail out of county jail unit number nine, where they're initially processed, is you go into the general custody with all of the other inmates who are serving sentences that could be many months. Well, you know, Your Honor, since January of 2004, the sheriff has done just that, placed this class of persons without strip search into the general population prior to arraignment, and not a single instance has been brought before this court where any contraband has been discovered as a result of that. I thought we had the one where the guy was arrested for public nuisance under PC. And I have that page right in front of me, Your Honor. That's 527 of the page recited. 527, yeah. He was brought in on a 647F, but there is no evidence as to what this person's prior history had been. And they had an opportunity to present that. In other words, had he in the last five years been brought in on a charge relating to drugs, weapons, or violence? Had he been on probation or parole? Was there reasonable suspicion? That is not documented at all. So we don't know that this person is a member of the class. Well, I'm looking at 603. I don't know if that's the same. It's the field arrest card where the charge is indicated as a violation of Penal Code Section 372, which is just sort of the general public nuisance statute. We know nothing about this. We know nothing about this person. Other than the fact that the person was arrested for a minor offense. That's all. But this class does not include all persons who are arrested on a minor offense. It excludes persons who were on probation or parole or searchable probation, who have been previously arrested for crimes relating to violence, drugs, or weapons, and or for whom there was reasonable suspicion to believe they were concealing something. For instance, if this person was acting strangely, that would be reasonable suspicion. The threshold is very low. It's a very low threshold. They can strip search almost anybody they want if they can articulate a reason to believe that the person might be concealing contraband or weapons. What we're saying is that ---- It didn't matter what the inmate was in jail for. Yes. Well, there are two points I'd like to make. First of all, that's post-arraignment. That's pretrial. We're talking about pretrial persons. And the Court ---- And I guess where I'm having the problem is you want to keep using this, you know, arraignment, post-arraignment, whether or not you've seen a judicial officer distinction. But I'm trying to focus on the institutional security needs of inside versus outside. And I'll just jump right by that. The first one I mentioned, it's a group of people that's different from the ones that are before you. But the second is an opportunity that the jail has no control over what visitors bring in unless they adopted a strip search policy that related to visitors. So if they're going to have a contact visit where visitors who can meet with the person who's in custody are not controlled in any way, then it is a possibility for exchange. And if there's no strip search possibility there, I'm not saying it has to be exercised in all instances, then the ---- presumably the inmate will be emboldened to arrange for some kind of transfer of some kind of contraband. That, I believe, is what underlie ---- underlay the Court's analysis. Well, how is that different, though, from the question that I think I posed   Well, the person may very well have been arrested for shoplifting, and that's the only thing we know about that person. But why should I presume that that individual is not necessarily going to be carrying some item of contraband that he happened to have on his person at the time he's arrested for a minor offense? Well, I think that there is some balancing that's involved. First of all, you do not just presume based on the charge alone. You have all the other indications that you could rely upon. Well, in my hypothetical, the only thing we know is a shoplifter. In other words, it's a pure ---- let's call it a pure person who has no previous contact, et cetera, just comes in and you go through the pat-down and you observe the person. There's no indication whatsoever. They're just like a schooled smuggler, and they're going to ---- and they have it Well, I'm not necessarily saying they're professional smugglers. I'm just saying how is it that the sheriff is to know if that person is not going to bail out and is going to be mixed in with the general inmate population? Why should we presume simply by virtue of the fact that they were arrested for shoplifting that they aren't necessarily in possession of an item of contraband or a weapon? Because we look at the invasion that a strip search and the intrusion that a strip search entails, and we say, we make a societal judgment that these people who are arrested, who are in the purest class, we're not going to humiliate, we're not going to subject to this just because there is a mere possibility, some ethereal thought that this person could possibly have something secreted where the sun doesn't shine. What evidence would be sufficient in your view to support a blanket strip search policy for this class? For this class, I would say that they would have to actually come forward and say that there's a significant percentage of people in this class who conceal contraband, and we have to get it, and we can't do it in any other way. If they could show that, and I think the court below was open to that and said, let's see the evidence, and concluded there was none. And just, there's one other point I want to make with this, Giles, because Giles said, oh, there were 11 instances over 18 months where there were 3,500 strip searches where contraband was discovered. In the city of San Francisco, over a five-year period, when 250,000 people were smuggled in, there were only 73 instances where persons in this, where contraband was found during a strip search. That's in the record. Only 73. And Judge Breyer tabulated that. Only 73 instances over that five-year period. That is one-tenth the frequency with which contraband was attempted to be smuggled in or was possessed by persons who were strip searched. Bell v. Wolfish, the Supreme Court said one was enough. Well, that's a different circumstance because you're talking about the contact, and you're talking about a clear avenue where contraband could flow in intentionally and planned, where, okay, you're going to call up your sister-in-law, and you're going to have a visit, and then the drugs are going to be delivered to you, and then you bring them back to the housing unit, et cetera. That is a clear attempt to interdict some kind of conscious drug smuggling. But in this situation, you're talking about the least conceivable group of people who could be, who already had these items secreted in a body cavity because they were arrested and just brought to jail without an opportunity to take some precautions to stock up, let's say, because they thought they would go into housing. So you're talking about an incident that happens with no planning, and then you're talking about the least offensive, and then you're talking about the shortest period of time. It wouldn't protect against a deliberate smuggling effort that essentially used as mules somebody who deliberately went out and committed a minor offense in order to get arrested. And then refused to be – well, of course, they would probably qualify for – they would probably qualify for bail, and then they'd have to refuse bail, and then they'd have to assume that they were actually going to go into housing before being arraigned. And, of course, we know that if they're taking a group for arraignment and somebody is available, they'll go there as opposed to going into housing. I guess one could – it's theoretically possible. And is that theoretical possibility sufficient to trample what are well-established Fourth Amendment rights to be protected against unreasonable searches? And I think our courts in this circuit have said no. Thank you, counsel. We'll give you some time for rebuttal. A couple minutes. Be careful. I'd like to make four points, if I can get to them. First, in answer to Judge Ikuda's question, Bellevue-Wolfish says that one is enough and that I think that a very useful Fourth Amendment framework for analysis comes from other suspicionless search cases that are not jail cases, and that's the Supreme Court's Chandler case. If the risk of harm is substantial and real and the response is calibrated to that risk, then the search doesn't violate the Fourth Amendment. So are you really saying that in places like San Francisco where pre-trial detainees, pre-arraignment detainees are to be housed at some point with the general population, that those people arrested have no Fourth Amendment rights at all? No, Your Honor, because I What Fourth Amendment rights can they have with respect to the search? The Fourth Amendment under this Court's rulings and under the Fourth Amendment reasonableness test says that you can't be searched while you're awaiting bail. We don't do that. You can't be searched if you're going to be eligible for site release, and we know it's very unlikely that you are going to be put in the general jail population. My question is talking about those who are destined for the general jail population who are members, let's say, members of the class. I mean, you're saying these class members. I mean, I'm not saying you may be right, you may be wrong, but your view is that these class members really don't have any right to privacy. No, Your Honor. I'm saying that under Belle v. Wolfish we are enforcing those rights, and those rights require not a statistical analysis, not a mechanical formulation, but a balancing of the risk and the harm. Pre-arraignment, on another point, is an arbitrary cutoff. It appears that this is a class chosen for pre-arraignment because it coincides with plaintiffs' state law claims. Under state statute, there are certain rights that only attach pre-arraignment. I don't believe it has to do with the Fourth Amendment analysis. And in Smith v. Montgomery, I want to respond to plaintiffs' citation in that case for the proposition that if you're pre-arraignment, you're a short-term detainee. First of all, the sheriff has no way of knowing if you don't post bail and you're not eligible for citation release, how long you are going to spend in the jail's custody. It could be nearly a matter of two days, 72 hours under state law until your arraignment. It could be longer, as Judge Tallman pointed out, if there's an intervening weekend and holiday. It could be even longer if you remain in custody until trial, months. And in San Francisco, it's been known to be years. But in Maryland, they said it was 24 hours because they have a different statutory framework. In Maryland, you have to be brought before the magistrate for your initial appearance within 24 hours. That's the law that they were applying in that case, and that's not the California procedures. And those are all the points I'm going to make on rebuttal, but I'd be happy to address other questions. You've changed your policy now, so basically this case is about damages, right? That's right. Well, no, Your Honor, this case is about what plaintiff can get as damages. What this case is about and what this appeal is about for the sheriff is what he considers and what law enforcement considers a very important policy question. So are you saying that if you prevail on this appeal, you're going to return to your old policy? If we prevail on this appeal because this Court has found that the Fourth Amendment is not offended under the former policy, which is they're not front-end strip searches, but only after you're likely to go into the general jail population, the record states that safety is better served, and that is the sheriff's top priority from protecting everybody with these searches. So I guess the answer is yes. Probably. Probably. Okay. Very good. Any further questions? Yeah, thank you. Thank you very much for your arguments and your briefs. It's a very interesting case, and it's been well presented by everybody. Thank you. We're going to take a ten-minute break. We'll be back.
judges: Thomas, Tallman, Ikuta